56 N.J. Super. 340 (1959)
153 A.2d 349
MURRAY JOSEPH, PLAINTIFF-APPELLANT,
v.
GUS LESNEVICH, ET AL., DEFENDANTS-RESPONDENTS.
Superior Court of New Jersey, Appellate Division.
Argued May 18, 1959.
Decided July 15, 1959.
*343 Before Judges CONFORD, FREUND and HANEMAN.
Mr. Robert J. Carluccio argued the cause for plaintiff-appellant (Messrs. Carluccio & Carluccio, attorneys).
Mr. Sidney Dincin argued the cause for defendants-respondents, Credit Discount Company and Max Grobow.
Mr. William Bannon argued the cause for defendant-respondent, Palisade Trust Company (Messrs. Milton, McNulty & Augelli, attorneys; Mr. Charles J. Milton, of counsel; Mr. Bannon on the brief).
The opinion of the court was delivered by FREUND, J.A.D.
Plaintiff, Murray Joseph, was the true owner of seven United States Treasury negotiable bonds, each in the amount of $1,000 and each payable to bearer. On March 23, 1951 the bonds were stolen from his home in Fort Lee. The burglary, together with the serial numbers of the instruments, was immediately reported to the municipal *344 police department and to the Federal Bureau of Investigation. Three newspapers circulated throughout or in parts of Bergen County reported the theft.
Two years and three months later a New York brokerage house presented the bonds to a redemption agent of the Treasury Department in Philadelphia. Treasury paid the redemption price to the bearer and notified the police and plaintiff. Over five years later plaintiff brought this action.
From the theft to the ultimate redemption, the bonds had a peculiar history. They found their way into the hands of five separate possessors, excluding the New York broker. It is against four of these five and against one other defendant that plaintiff proceeds  on the theory they are liable in tort for conversion of personalty. 89 C.J.S. Trover & Conversion § 14, p. 539.
Defendants Gus Lesnevich and Louis Gentilhuomo were partners engaged in the used car business in Cliffside Park in 1951, trading as Champ Motors. According to a statement Gentilhuomo gave the police, "Things at the used car lot were not going so well and we were on the verge of giving up the business." In October 1951 Lesnevich received a letter which he opened in the presence of his partner and two others. In the envelope were the seven $1,000 bonds with a letter reading:
"Dear Gus: I heard you were in need of financial help and I am sending these bonds to you to use for your business, I will see you sometime in the future and identify myself 
Your Pal and Friend"
Gentilhuomo asked Lesnevich "if this could be a joke of some kind and he said he didn't know," so Gentilhuomo said "lets go to Grobows, he should know."
Defendant Max Grobow was the president of the defendant Credit Discount Co. (hereinafter "credit company"), which had its office in Englewood and was engaged in the business of financing automobiles. By March 1951 it had extended to Champ Motors a line of credit up to $50,000. *345 The loans were secured by chattel mortgages and bills of sale on automobiles purchased by Champ Motors for resale.
According to Max Grobow's affidavit, Lesnevich and Gentilhuomo came to his office in early October 1951, stated that they could use additional funds to increase their stock of used cars, and offered the seven bonds as collateral security for a loan of $6,700. Grobow replied that he would accept the bonds as security, and the partners returned on October 21 with the bonds to consummate the pledge. Lesnevich received a check from credit company for $6,700, drawn on the defendant Palisade Trust Company (hereinafter "the bank"). The bank also had its office in Englewood.
Grobow stated in his affidavit that the bonds pledged were complete and regular on their face, that his company took them before they were overdue, in good faith, for value, and without notice of any infirmity in the instruments or defect in the title of the partners-pledgeors.
Near the end of July 1952 Lesnevich and Gentilhuomo advised the credit company they would not repay the collateral loan and hence would not retake the bonds. They requested the pledgee to use the proceeds of the bonds as payment on the amounts then due and return to them any difference. Accordingly, on August 1, 1952 the credit company closed out the partnership's account and issued a check to Champ Motors for the balance of $171.68. On the same day, Max Grobow personally purchased the bonds from his company. On September 9, 1952 Max sold the bonds to his son, Edward Grobow (now deceased), for $6,950. On June 16, 1953 Edward executed two forms appointing the Palisade Trust Company as his agent to collect the proceeds of the bonds. The bank in turn placed the order with its New York broker, with the results noted above. Having received net proceeds of $6,380.09 on the bonds, the bank credited Edward's account therewith on June 18, 1953. Kenneth A. Bentley, the bank's assistant vice-president, deposed in an affidavit of record that the bonds appeared to him to be genuine and that there was nothing in Edward's conduct or in any previous *346 association with him to cause doubt that Edward had title to and the right to sell the bonds.
Plaintiff's complaint names as converters: Lesnevich and Gentilhuomo, on the theory of receipt of stolen property and vicarious partnership liability; the credit company and Max Grobow, on the theory they had notice of suspicious circumstances and could not qualify as holders in due course; and the bank, on the theory it "knew or should have known the suspicious surroundings * * *." Edward Grobow's estate was not made a party to the suit. In support of the claim of notice of suspicious circumstances on the part of Grobow and the credit company, the complaint contains the following crucial allegations respecting the Lesnevich-to-credit company transfer:
"5. * * * Mr. Max Grobow * * * in turn had someone call the Defendant Palisade Trust Company to check the validity of the bonds.
6. A few minutes later, Mr. Max Grobow * * * said to the Defendants Lesnevich and Gentilhuomo upon information and belief, that the bonds were good, even if you found them on the street.
7. The Defendants Gus Lesnevich and Louis Gentilhuomo thereupon pledged said bonds * * *."
Lesnevich in his answer admitted the allegations in the fifth and sixth paragraphs.
The credit company, Grobow, and the bank moved for summary judgment. Although in an action for the conversion of personalty it is no defense to assert the status of a bona fide purchaser for value where the transferor (Lesnevich) had no power to transfer (Ashton v. Allen, 70 N.J.L. 117 (Sup. Ct. 1903); Prosser, Torts (2d ed. 1955), § 15, pp. 71-72; 1 Restatement, Torts, § 229, p. 585), a commonly recognized exception to this rule is in the case of negotiable instruments where the defendant qualifies as a holder in due course. See, e.g., Prosser, supra, at p. 72, note 77 and cases cited. Cf. City of Elizabeth v. Force, 29 N.J. Eq. 587 (E. & A. 1878); Boyd v. Kennedy, 38 N.J.L. 146 (Sup. Ct. 1875). The positions of the credit *347 company and Grobow on the one hand and the bank on the other were different in one respect. Grobow and his company claimed to be entitled to the benefit of the exception in favor of holders in due course. The bank made no such claim but contended that it acted as agent in good faith without notice of any defect in its principal's (Edward Grobow's) title to the bonds.
The trial judge of the Law Division found no genuine issue as to any material fact and that the above-named movants were entitled to judgment as a matter of law. R.R. 4:58-3. Plaintiff appeals, generally on the ground that the pleadings and affidavits raise triable issues of fact as to whether these defendants were on notice of his rights in the bonds at the times they respectively acquired possession.
Preliminarily, we touch upon two procedural questions relating to the taking of the appeal, not raised by defendants. Plaintiff's notice of appeal, filed December 29, 1958, states that the summary judgment was entered on November 11, 1958. If accurate, the appeal would be untimely as beyond the 45-day limit permitted by R.R. 1:3-1(b). We have ascertained from the record on file in the clerk's office that the judgment was actually entered on November 19, the day recited as the day of entry in the trial judge's opinion. Indeed, the inaccuracy in the notice of appeal is patent since the notice of motion for summary judgment was not returnable until November 13. Plaintiff should correct the record accordingly.
Secondly, the claims against Lesnevich and Gentilhuomo remain undisposed of and are still pending in the Law Division. There is thus a question as to whether the summary judgment was merely, in effect, an interlocutory order, not susceptible of appeal without obtaining leave of court. R.R. 2:2-3(a). This court recently reviewed the problem and pertinent authorities in Sarnicandro v. Lake Developers, Inc., 55 N.J. Super. 475, 478 (App. Div. 1959), and the conclusion there reached was in favor of entertaining the appeal, the parties not having argued or considered the *348 possibility of a procedural bar. There being no question but that leave to appeal would have been granted had application been made therefor, we proceed to a consideration of the merits without further discussion of the finality of the judgment as to the defendants-respondents.
We consider first the correctness of the trial action in relation to the defendants Grobow and credit company.
Our statute, R.S. 7:2-52 (Uniform Negotiable Instruments Law, § 52), defines a holder in due course as a holder who has taken the instrument under the following conditions, among others:
"III. That he took it in good faith and for value;
IV. That at the time it was negotiated to him he had no notice of any infirmity in the instrument or defect in the title of the person negotiating it."
Notice of a defect in the title of the person negotiating the instrument is defined as "actual knowledge of the * * * defect, or knowledge of such facts that his action in taking the instrument amounted to bad faith." R.S. 7:2-56 (N.I.L. § 56). Once the transferor's title is shown to be defective, as here, the burden is upon the holder to prove he acquired the title as holder in due course. R.S. 7:2-59 (N.I.L. § 59).
It is settled that proof of circumstances calculated merely to arouse suspicion will not disentitle one from the status of a holder in due course. Driscoll v. Burlington-Bristol Bridge Co., 8 N.J. 433, 480 (1952), cert. denied 344 U.S. 838, 73 S.Ct. 25, 97 L.Ed. 652, reh. denied 344 U.S. 888, 73 S.Ct. 181, 97 L.Ed. 687; Eastern Acceptance Corp. v. Kavlick, 10 N.J. Super. 253, 257 (App. Div. 1950). Evidence of suspicious circumstances is of probative value only insofar as it conduces to a finding of active bad faith. The purchaser of a negotiable instrument is not subject to constructive notice afforded by public record or newspaper. Gilmore, "Good Faith Purchase," 63 Yale L.J. 1057 (1954). Carelessness or negligence in purchasing the instrument is *349 significant only when, taken in connection with other matters, it evidences bad faith. Mutual Finance Corp. v. Dickerson, 123 N.J.L. 62, 65 (Sup. Ct. 1939); 4 Williston, Contracts (rev. ed. 1936), § 1157, p. 3333. The duty of inquiry devolves upon such purchaser only to the extent that the failure to make inquiry indicates "a deliberate desire on his part to evade knowledge because of a belief or fear that investigation would disclose a vice in the transaction." First National Bank v. Goldberg, 340 Pa. 397, 17 A.2d 377, 379 (Sup. Ct. 1941). See also Graham v. White-Phillips Co., 296 U.S. 27, 56 S.Ct. 21, 80 L.Ed. 20, 102 A.L.R. 24 (1935); In re Stroudsburg Security Trust Co., 145 Pa. Super. 44, 20 A.2d 890 (Super. Ct. 1941).
The first area of dispute between the parties concerns whether or not a factual question existed in relation to the contention that the credit company and Max Grobow had knowledge of such facts that their action in acquiring the bonds amounted to bad faith. This, in turn, involves the application of the summary judgment rule, R.R. 4:58, as construed by the cases.
Summary judgment may be rendered only "if the pleadings, depositions, and admissions on file, together with the affidavits, if any, show palpably that there is no genuine issue as to any material fact challenged and that the moving party is entitled to a judgment or order as a matter of law. * * *" R.R. 4:58-3. Affidavits on such a motion must be on personal knowledge, not hearsay. R.R. 4:58-6. Should a party opposing a motion for summary judgment show by affidavit that he cannot for specific reasons present essential facts in opposition, the court may deny the motion or order a continuance to permit affidavits to be obtained, depositions to be taken, or discovery to be had, or it may make any other just order. R.R. 4:58-7.
Two general inquiries are projected in application to the matter before us. (1) If it was required to be assumed for purposes of the motion before the trial court that an issue of fact was presented as to whether Lesnevich informed *350 Grobow of the circumstances under which he came into possession of the bonds, was that factual issue a material one? In other words, on a finding in the affirmative as to the existence of such facts, would a jury properly be permitted to decide that Grobow had taken the bonds in bad faith so that his company and he were not holders in due course? (2) On the affidavits presented by the opposing sides here, was it appropriate for the trial court to conclude that no factual issue was presented concerning Grobow's having received the information as to how Lesnevich obtained the bonds?
We consider these questions in inverse order.
Defendants argue that they were not required to meet the facts stated in the complaint as plaintiff did not verify them by affidavit on the motion for summary judgment. Plaintiff responds that he could not substantiate by affidavit the recitals in the complaint as to notice of suspicious circumstances because he had no personal knowledge of the conversations with Grobow and because testimony would have to be elicited from Lesnevich and Gentilhuomo, whom he could not control on the motion for summary judgment. He points to Lesnevich's answer, concededly not binding on the other defendants, admitting the recital of the circumstances attending the submission of the bonds to Grobow.
In the case before us plaintiff obviously could not have made an affidavit as to the dealings between Lesnevich and Gentilhuomo on the one hand, and Grobow and the credit company on the other, because having no personal knowledge of the facts had to depend upon the defendant for his proof. In such a case the trial court was required to be critical of the moving papers but not of those in opposition. Monmouth Lumber Co. v. Indemnity Ins. Co., 21 N.J. 439, 449 (1956); Judson v. Peoples Bank and Trust Company of Westfield, 17 N.J. 67, 76 (1953). This is particularly true when such subjective facts as good faith on the part of the moving party are drawn in question, as here. Ibid. See also Congdon v. Jersey Construction Co., 55 N.J. Super. *351 571, 580 (App. Div. 1959), indicating that great caution should be exercised in passing on a motion for summary judgment against a party who is heavily dependent upon the production by his adversary of evidence and factual data pertinent to his claim or position.
A critical examination discloses that Grobow's affidavit leaves much to be desired, under the rules of the foregoing cases. It contains no specific and circumstantial denial of the facts stated in the complaint, or clearly inferable therefrom, as to Lesnevich's bringing the bonds to him and Grobow's checking with the bank on the significance of Lesnevich's story as to how he came into possession of the bonds. The affidavit is a mere conclusional assertion of good faith and absence of facts sufficient to put him on notice. Consider, moreover, that the trial court, without objection from either counsel, stated it was willing to accept as in affidavit form, for the purpose of the motion, a statement Gentilhuomo had given the police, which clearly implied that Grobow was told how Lesnevich came into possession of the bonds.
If the facts mentioned were material on the issue of good faith, the court would not have been justified in finding, as defendant Grobow argues, that these facts were not sufficiently asserted by the plaintiff. Neither would it have been justified in granting summary judgment on that basis. It should have required a specific and circumstantial denial of the facts in an affidavit by Grobow, and if that were forthcoming, given plaintiff an opportunity to obtain controverting proof by affidavit, depositions or answers to interrogatories by Lesnevich and Gentilhuomo.
Our position on the first issue posed above, i.e., as to the materiality of the facts stated in (or sufficiently inferable from) the complaint, is in the affirmative. In our judgment, if the fact-finder at a trial concluded that Lesnevich related his story to Grobow as to the circumstances under which he acquired the bonds, it would also have been within its purview to decide that Grobow took the bonds in bad *352 faith, i.e., that he designedly refrained from pursuing an inquiry as to defects in Lesnevich's title to the bonds because of a fear that investigation would disclose a vice in the transaction. The sheer incredibility of the story as to the letter from the "Pal and Friend" and the ready availability of the facts, by inquiry of the Treasury Department, as to whether the bonds (the serial numbers of which had been reported to the Treasury Department), had been lost or stolen, made the issue of good or bad faith one upon which the jury could have found against Grobow and the credit company. Were there such a finding Grobow and the credit company could not be regarded as holders in due course.
We therefore conclude that summary judgment was improperly granted as to the defendants Grobow and credit company insofar as the issue of their status as holders in due course is concerned.
The entry of summary judgment in favor of the Palisade Trust Company, however, is unassailable. This is not an action for negligence or wrongful conduct on the part of the bank in transmitting information to Grobow with respect to the validity of the bonds. The only possible liability suggested on the bank's part is in its committing an act of conversion in acting as Edward Grobow's agent in liquidating the bonds in 1953. But there is utterly nothing in the papers of record from which an inference can be drawn that the bank in collecting the proceeds on the bonds in 1953 had knowledge that they were the same bonds which had been sent to Lesnevich and pledged to the credit company in 1951. There is nothing to indicate the bank had reason to doubt Edward's title to, and right to redeem, the bonds. The authorities cited in the brief submitted on behalf of the bank clearly sustain the propriety of the dismissal of the claim against it. See First National Bank v. Goldberg, supra; Gruntal v. United States Fidelity & Guaranty Co., 254 N.Y. 468, 173 N.E. 682, 73 A.L.R. 1337 (Ct. App. 1930); Annotation, "Liability to true owner of broker or other agent who sells negotiable securities which *353 have been stolen," 73 A.L.R. 1342 (1931); 1 Restatement, Torts, § 233(3), p. 596; 2 Restatement, Agency, § 349, comment (g), p. 769; 8 Am. Jur., Brokers, § 134, p. 1062.
Insofar as Grobow and the credit company are concerned, there remains for consideration the question as to whether summary judgment was not properly entered in their favor on the theory of the statute of limitations. N.J.S. 2A:14-1 provides for a six-year period of limitations on actions for the conversion of personal property. Plaintiff filed his complaint on July 31, 1958. The bonds were stolen from plaintiff in March 1951. Lesnevich received them on about October 1, 1951. He pledged them to the credit company on October 21, 1951. Max Grobow purchased them from the credit company on August 1, 1952. Thus the suit was commenced more than six years from the date of theft, of their receipt by Lesnevich, and of their transfer to the credit company. Grobow's purchase was within one day of the six-year period.
The question is: When did plaintiff's cause of action for conversion accrue? Did the time begin to run from the date of the theft, or did the time begin to run on different dates as against each successive alleged converter? If the latter, may one alleged converter (Grobow) whose alleged conversionary act took place within the six-year period "tack" on any time within which the bonds were in the possession of transferors in his chain of title?
Defendants maintain plaintiff's cause of action accrued at the date of the theft and that the action is consequently barred. Cited in support for their position is a single sentence from Weiss v. Stelling, 130 N.J.L. 235, 237 (E. & A. 1943):
"A cause of action for the conversion of chattels is complete when the chattel is first tortiously taken."
Compare Lowney v. Knott, 83 R.I. 505, 120 A.2d 552, 57 A.L.R.2d 1036 (Sup. Ct. 1956), where the court said:
*354 "It is well established that a cause of action in trover does not accrue to the aggrieved party in all instances at the time of conversion." (120 A.2d at page 554)
We cannot attribute to the Weiss court an intention to lay down as a general proposition any rule to the effect that a cause of action for the conversion of personalty accrues as against subsequent converters when the chattel is first tortiously taken by the thief. This is evident from the reference in Weiss to 4 Restatement, Torts, § 899(c), p. 526, where the rule is stated to be that:
"A cause of action for the conversion of chattels is complete when the chattel is first tortiously taken or retained by the defendant. * * *" (Emphasis added)
That the Restatement was not using the term "defendant" synonymously with "thief" is made clear by a subsequent sentence in the paragraph indicating that the defendant may in some cases tack on the time within which a thief or previous taker had possession. It should also be noted that even as to a thief, the period does not begin to run until the thief affords the true owner a reasonable opportunity of knowing the whereabouts of the property and of asserting his title. See 34 Am. Jur., Limitation of Actions, § 135, p. 109. Cf. 54 C.J.S. Limitations of Actions § 119, p. 23.
We are therefore satisfied that the period of limitations did not commence to run against the defendants herein as of March 1951 merely because that was the date of the original theft.
The next question is when did each of the defendants "tortiously take" the chattel. Specifically, did the credit company commit a conversionary act when it asserted a security interest in the bonds as pledgee or was a conversion committed only on August 1, 1952 when the company exercised full dominion over the bonds by selling them to its president? 1 Restatement, Torts, § 229, p. 585, holds that the mere acquisition of property from one who has no power to transfer the same renders the purported vendee, lessee, pledgee, donee, *355 or bailee liable in conversion. As to such persons, the weight of authority is that a demand and refusal is not necessary to trigger the accrual of the cause of action held by the true owner. See Prosser, Torts (2d ed. 1955), § 15, pp. 72-73, text at notes 74, 75. Compare Mueller v. Technical Devices Corp., 8 N.J. 201, 208 (1951). It therefore appears that under the Weiss case plaintiff's cause of action accrued as against the credit company when it became pledgee of the bonds on October 21, 1951.
It is settled that ignorance of the facts giving rise to the cause of action does not prevent the statute of limitations from running. Weinstein v. Blanchard, 109 N.J.L. 332 (E. & A. 1932); Sullivan v. Stout, 120 N.J.L. 304, 118 A.L.R. 211 (E. & A. 1938); Zimmerman v. Cherivtch, 5 N.J. Super. 590 (Law Div. 1949); 6 Williston, Contracts (rev. ed. 1938), § 2020, p. 5675. An exception to the rule has been recognized in a majority of jurisdictions in cases of fraudulent concealment. But in the absence of fraudulent concealment, the fact that a person has no knowledge of the identity of the thief or converter will not prevent the statute of limitations from running in favor of persons who have dealt with the property without knowledge it has been stolen. See Annotation, 136 A.L.R. 658 (1942).
In the present case, although there is a question of fact as to whether the credit company and Grobow were holders in due course, there is nothing to indicate that they had actual knowledge of the fact the bonds were stolen property, that they failed to hold the bonds as openly and notoriously as the nature of the property would permit, or that they were guilty of any other affirmative act of wrongdoing. Nor are there facts to the contrary stated in the complaint. Compare Quimby v. Blackey, 63 N.H. 77 (Sup. Ct. 1884); Vaut v. Gatlin, 31 Okl. 394, 398, 120 P. 273 (Sup. Ct. 1911); Chilton v. Carpenter, 78 Okl. 210, 189 P. 747 (Sup. Ct. 1920); 2 C.J.S. Adverse Possession § 239, p. 885; 34 Am. Jur., Limitation of Actions, § 136, p. 110. *356 If the defendants or those in privity with them did not participate in the fraudulent acts, the defendants cannot be deprived of the benefit of the statute of limitations. Munson v. Hallowell, 26 Tex. 475 (1863); 54 C.J.S. Limitations of Actions § 207, p. 229.
In Cutshall v. Yates, 95 Okl. 277, 219 P. 343 (Sup. Ct. 1923), an instruction to the jury that limitations began from the time plaintiff had knowledge of the defendant's possession of misappropriated jewelry was held to constitute reversible error. To like effect see Blount v. Parker, 78 N.C. 128 (Sup. Ct. 1878). Commercial Union Ins. Co. v. Connolly, 183 Minn. 1, 235 N.W. 634 (Sup. Ct. 1931), the case most nearly in point, was an action in replevin by the owner of stolen negotiable bonds against one who claimed to be a purchaser in good faith. The court held the defendant not to be a holder in due course and rejected the defense of limitations because the defendant had come into open possession of the bonds well within the period of limitations, said open possession being evidenced by a sale of the bonds to the defendant. In the instant case, the credit company's "open possession" of the bonds commenced on October 21, 1951, which was beyond the period of limitations.
Noel v. Teffeau, 116 N.J. Eq. 446 (Ch. 1934), and State v. United States Steel Corp., 22 N.J. 341, 357 (1956), establish that parties under a statutory or moral duty to inform the plaintiff of the facts giving rise to a cause of action may be estopped to assert the defense of limitations. Such cases are not apposite where, as here, the defendant is not claimed to have had knowledge of the identity of the plaintiff or of his rights.
We have been cited to no authority, nor have we been able to find any, that would indicate that the statute of limitations, in the circumstances of this case, would begin to run on some date other than when the credit company took the bonds as pledged property on October 21, 1951. That being so, it matters not that plaintiff first discovered *357 the whereabouts of the bonds in 1953; suit was not instituted until 1958, which was beyond the six-year period.
A word is necessary in relation to the right of the defendant Grobow to assert the defense of limitations. His independent conversionary act took place within the six-year period. The subject of whether a subsequent wrongful transfer will alter the running of the period as from the original conversion is exhaustively considered in O'Connell v. Chicago Park District, 376 Ill. 550, 34 N.E.2d 836, 135 A.L.R. 698 (Sup. Ct. 1941). The court applied the theory suggested by Professor Ames that the doctrine of tacking adverse possession, firmly established with relation to land (see, e.g., O'Brien v. Bilow, 121 N.J.L. 576, 579 (E. & A. 1938)), should be applied to the case of successive conversions of chattels. See also Loughran v. Town of Pelham, 126 F.2d 714 (2 Cir. 1942); 41 Am. Jur., Pledge and Collateral Security, § 61, p. 626; 4 Restatement, Torts, § 899, p. 526; 2 C.J.S. Adverse Possession § 237, p. 884. In this view, which we deem sound in principle, plaintiff's action against the defendant Grobow is also barred.
Accordingly, the entry of summary judgment in favor of the defendants credit company and Grobow must be affirmed, as well as that in favor of the bank.